Kass Harstad (Bar No. 11012)
Chad Johnson (Bar No. 17555)
**STRINDBERG SCHOLNICK BIRCH
HALLAM HARSTAD THORNE**
675 East 2100 South, Suite 350
Salt Lake City, Utah 84106
Telephone:   801-359-4169
Facsimile:    801-359-4313
Email: kass@utahjobjustice.com
       chad@idahojobjustice.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| **DARIO ALEJANDRO VILCHEZ**, <br><br> Plaintiff, <br><br> vs. <br><br> **Kunzler Sheep & Cattle, L.L.C.; Kunzler Sheep And Cattle Trucking, L.L.C.; Kunzler Sheep, Cattle And Land, L.L.C.; Burt C. Kunzler; Kerry U. Kunzler; and Kelly U. Kunzler,** <br><br> Defendants. | **COMPLAINT (JURY DEMANDED)** <br><br><br> Civil No. <br><br> Judge |

Plaintiff Dario Vilchez ("Mr. Vilchez" or "Plaintiff") complains and alleges against

Defendants Kunzler Sheep & Cattle, L.L.C. ("Kunzler S & C"); Kunzler Sheep and Cattle

Trucking, L.L.C.; Kunzler Sheep, Cattle and Land, L.L.C.; Burt C. Kunzler ("Burt

Kunzler" or "Burt"); Kerry U. Kunzler ("Kerry Kunzler" or "Kerry"); and Kelly U.

Kunzler ("Kelly Kunzler" or "Kelly") (collectively, "Defendants"), as follows:

## NATURE OF CASE

1.      This suit is brought by Dario Vilchez, an H-2A visa holder who was hired by and signed an H-2A employment contract with Kunzler S & C to come from Peru to the United States to work as a sheepherder in Utah.

2.      Defendants treated Mr. Vilchez not as a sheepherder, but as a ranch hand, and required him to complete tasks well beyond those allowed by his H-2A employment contract and visa.

3.      Additionally, Defendants subjected Mr. Vilchez to a continuing pattern of physical deprivation and psychological abuse including, but not limited to, cruel and lengthy working conditions, insufficient drinking water, insufficient housing, inadequate access to healthcare, threats of serious bodily harm, and confiscation of legal documents.

4.      Mr. Vilchez brings this action to recover damages for injuries inflicted by Defendants under the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. ("FLSA"), the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1589 et seq. ("TVPRA"), and for common law claims under Utah law for breach of contract, intentional infliction of emotional distress, negligent infliction of emotional distress, and quantum meruit.

5.      Plaintiff seeks all available equitable relief, damages, attorneys' fees, costs, and interest.

## PARTIES

6.       Plaintiff Dario Vilchez is an adult individual, competent to bring this action, a citizen of Peru, and a resident of Salt Lake County, Utah. He was employed by Defendants from March of 2002 to November 30, 2020.

5.      Defendant Kunzler S & C is a limited liability company organized under the laws of the State of Utah. The company was named Kunzler Brothers, L.L.C. from 1998 until 2005, at which time it changed its name to Kunzler Sheep & Cattle, L.L.C. The company's principal place of business is in Park Valley, Box Elder County, Utah, and it was organized for the purpose of owning and operating farms and ranches. Its members are Defendants Burt Kunzler, Kerry Kunzler, and Kelly Kunzler.

6.      Defendant Kunzler Sheep and Cattle Trucking, L.L.C., is a limited liability company organized under the laws of the State of Utah. The company's principal place of business is in Park Valley, Box Elder County, Utah, and it was organized to own, operate, and maintain vehicles and trucks, and to engage in the business of transportation. Its members are Defendants Burt Kunzler, Kerry Kunzler, and Kelly Kunzler.

7.      Defendant Kunzler Sheep, Cattle and Land, L.L.C., is a limited liability company organized under the laws of the State of Utah. The company's principal place of business is in Park Valley, Box Elder County, Utah, and it was organized to acquire farms and other real estate used to cultivate plants, to raise livestock, and to conduct business incidental to farming. Its members are Defendants Burt Kunzler, Kerry Kunzler, and Kelly Kunzler.

8.      Defendants Burt Kunzler, Kerry Kunzler, and Kelly Kunzler are brothers.

9.      Burt Kunzler is a resident of Box Elder County, Utah. He is responsible for petitioning for the H-2A visas that Defendants obtain, and he primarily runs Defendants' sheep operations.

10.    Kelly Kunzler is a resident of Box Elder County, Utah, and he primarily runs Defendants' cattle operations.

11.    Kerry Kunzler is a resident of Box Elder County, Utah, and he primarily runs Defendants' alfalfa growing operations.

12.    Upon information and belief, Defendants were a joint employer of Mr. Vilchez and their other H-2A employees, because all Defendants exercised significant control over the terms and conditions of their employment. Indeed, all Defendants promulgated work rules and assignments, set conditions and hours of employment, engaged in the day-to-day supervision of Mr. Vilchez and the other H-2A employees, and had the right to terminate their employment.

## JURISDICTION AND VENUE

13.    This Court has original jurisdiction under the provisions of 28 U.S.C. § 1331 with respect to Plaintiff's claims arising under federal law, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 with respect to Plaintiff's state law claims.

14.    Venue is proper with this Court under 28 U.S. Code § 1391 as Defendants reside, and Plaintiff's claims occurred, within the District of Utah.

## GENERAL ALLEGATIONS

### The H-2A Visa Program

15.    The H-2A temporary agricultural visa program allows agricultural employers who anticipate a shortage of domestic workers to bring nonimmigrant foreign workers to the U.S. to perform agricultural labor or services of a temporary or seasonal nature. 8 U.S.C. § 1188.

16.    To receive H-2A visas, an employer must submit an H-2A application to the U.S. Department of Labor ("DOL").

17.    That application must include a "job offer" containing the material terms and conditions of employment.

18.    Regulations found at 20 C.F.R. § 655.122 and §655.135 govern the minimum contents of job offers. As part of the job offers, employers are required to:

      a.    Pay wages at least twice per month;

      b.    Provide workers' compensation insurance coverage in compliance with State law covering injury and disease arising out of and in the course of the worker's employment;

      c.    Keep accurate records with regard to employees' earnings and hours, and provide such documentation to its employees on each payday;

      d.    Provide housing that complies with DOL standards, at no cost to the employee;

      e.    Promise to comply with applicable federal, state, and local employment related laws and regulations, including but not limited to the FLSA;

      f.    Promise not to hold or confiscate workers' passports, visas, or other immigrant documents; and

      g.    Promise not to "intimidate, threaten, restrain, coerce, blacklist, discharge, or in any manner discriminate against" any person who has exercised his rights under the applicable regulations.

19.     The job offers must also contain an employee's minimum wage. See 29 C.F.R. 655.122.

20.     Employers who hire H-2A workers to fill positions in herding and production of livestock on the range pay a wage much lower than that for other agricultural work.

21.     In Utah, as set forth in the chart below, the minimum monthly wage (known as the Adverse Effect Wage Rate ("AEWR")) for H-2A employees engaged in herding and production of livestock on the range has always been much lower than the AEWR for other agricultural workers on H-2A visas:

|  | AEWR for H-2A employees engaged in range production of livestock | AEWR for other agricultural workers on H-2A visas |
|---|---|---|
| 2011 | $750 per month | $10.48 per hour |
| 2012 | $750 per month | $10.43 per hour |
| 2013 | $750 per month | $10.08 per hour |
| 2014 | $750 per month | $10.89 per hour |
| 2015 | $750 per month | $11.37 per hour |
| 2016 | $1206 per month | $11.27 per hour |
| 2017 | $1389 per month | $11.00 per hour |
| 2018 | $1544 per month | $10.69 per hour |
| 2019 | $1682 per month | $13.13 per hour |
| 2020 | $1727 per month | $14.26 per hour |

22.     An employee is engaged in herding and production of livestock on the range (and can therefore be paid the lower monthly rate) only if he works "on the range" more than 50 percent of the workdays of the work contract, and any additional work performed at a place other than "on the range" must constitute "production of livestock." The program is intended for employees that need to be on call 24 hours per day, 7 days a week.

23.     The applicable regulations explicitly define "Range" and "Ranch headquarters."   The range is any area located away from the ranch headquarters and

typically includes uncultivated expanses of land in remote areas where herders are required to constantly attend to the animals. In contrast, ranch headquarters is defined as a more limited place where the business of the ranch occurs and typically includes a ranch house, barns, sheds, pen, bunkhouse cookhouse, and other buildings.

24.     The term "production of livestock" includes duties performed off the range that are closely and directly related to herding and/or the production of livestock. 20 CFR § 655.201 provides non-exclusive examples of ranch work that are closely and directly related to herding and/or the production of livestock, including:

> Repairing fences used to contain the herd; assembling lambing jugs; cleaning out lambing jugs; feeding and caring for the dogs that the workers use on the range to assist with herding or guarding the flock; feeding and caring for the horses that the workers use on the range to help with herding or to move the sheep camps and supplies; and loading animals into livestock trucks for movement to the range or to market.

25.     20 CFR § 655.201 also provides examples of ranch work that are not closely and directly related to "production of livestock," including:

> Working at feedlots; planting, irrigating and harvesting crops; operating or repairing heavy equipment; constructing wells or dams; digging irrigation ditches; applying weed control; cutting trees or chopping wood; constructing or repairing the bunkhouse or other ranch buildings; and delivering supplies from the ranch to the herders on the range.

26.     If an H-2A employee spends more than 50% of his time herding and/or working "on the range," and spends any additional time engaged in the "production of livestock," the employer may pay the H-2A employee the lower, monthly rate.

27.     However, if an H-2A employee does not spend more than 50% of his time herding and/or working the range, "the employer must pay the worker at least the AEWR,

the prevailing hourly wage rate, the prevailing piece rate, the agreed-upon collective bargaining rate, or the Federal or State minimum wage rate, in effect at the time work is performed, whichever is highest, for every hour or portion thereof worked during a pay period." 20 C.F.R. 655.122.

28.     The applicable regulations also provide living standards for H-2A herders. Specifically, pursuant to 20 CFR § 655.235,

a.     "The employer must provide each worker at least 4.5 gallons of potable water, per day, for drinking and cooking, delivered on a regular basis, so that the workers will have at least this amount available for their use until this supply is next replenished"; and

b.     "A separate comfortable and clean bed, cot, or bunk, with a clean mattress, must be provided for each person, except in a family arrangement."

## Mr. Vilchez's H-2A Work Contracts

29.     From 2002 to 2020, Kunzler S & C filed H-2A applications, supposedly seeking employees to fill positions in herding and production of livestock on the range.

30.     The H-2A visa applications filed by Kunzler S & C were approved by the U.S. government.

31.     Pursuant to the approved visa applications, Kunzler S & C provided Mr. Vilchez with annual "work contracts" from March, 2002, to November, 2020. These annual work contracts generally ran from February or March to late November each year, and Mr. Vilchez returned to Peru during the off-season (*i.e.*, in December and January each year).

32.     The H-2A regulations in general, and the terms of the job offers in particular, were incorporated into the work contracts. *See* 20 C.F.R. §655.122; 29 C.F.R. §501.3.

33.     Pursuant to the work contracts, Mr. Vilchez had to be available 24 hours per day, seven days per week, and he was supposed to spend the majority (more than 50%) of his working days on the range. *See*, *e.g.*, Exhibit A.

34.     Furthermore, the contracts required that all of Mr. Vilchez's work be directly related to production of livestock, and in accordance with the H-2A visa requirements, Mr. Vilchez's contracts describe the requirements of the job to include, in part, feeding, watering, protecting, handling, examining, and spraying the livestock. *See*, *e.g.*, *id*.

35.     Finally, the contracts: contain minimum requirements for housing, food and water; require Kunzler S & C to pay Mr. Vilchez twice per month; and require that Kunzler S & C comply with the FLSA and all other applicable federal laws and regulations. *See*, *e.g.*, *id*.

### Mr. Vilchez Worked as a Ranch Hand at Ranch Headquarters, not on the Range or in the Production of Livestock

36.     During the 19 years that Mr. Vilchez worked for Defendants, he served primarily as a ranch hand, and not as a herder.

37.     Specifically, Mr. Vilchez resided and worked at ranch headquarters all but a few days each month.

38.     Mr. Vilchez spent so much time working at ranch headquarters that Defendants Burt Kunzler, Kerry Kunzler and Kelly Kunzler (the "Brothers") constantly monitored his work and dictated how he spent his days.

39.     Additionally, the Brothers required Mr. Vilchez to perform numerous tasks unrelated to herding or the production of livestock.

40.     For example, in the first few months that Defendants employed Mr. Vilchez in 2002, the Brothers learned that he had past experience working as a mechanic. As such, the Brothers began requiring Mr. Vichez to spend vast amounts of time working as a mechanic on its various trucks and machinery at ranch headquarters. Defendants continued to assign Mr. Vilchez mechanic jobs at ranch headquarters throughout his employment until he left in November, 2020.

41.     For the last 10 years of his employment, Mr. Vilchez spent approximately 15 hours per week working as a mechanic at ranch headquarters.

42.     In 2008, Burt Kunzler also began assigning Mr. Vilchez driving jobs. From 2008 until Mr. Vilchez left in 2020, Burt tasked Mr. Vilchez with repeated trips in which he had to drive a large semi-truck to various destinations, including Idaho and Wyoming, despite not having commercial driving privileges in the United States.  Burt promised Mr. Vilchez additional pay for completing these trips but never followed through with the promise.

43.     In 2012, Defendants tasked Mr. Vilchez with building 10 miles of fence without any extra pay. The project included constructing new fences to protect alfalfa fields from livestock and to separate the Defendant's property from Bureau of Land Management ("BLM") property. Nearly all the fencing occurred in the ranch headquarters vicinity, while a small portion occurred approximately five miles from the headquarters. Defendants told Mr. Vilchez that they would receive a Department of Agriculture grant for the project and

would pay him extra for taking on the additional work. However, Defendants failed to pay Mr. Vilchez for this extra work.

44.     Defendants also repeatedly assigned Mr. Vilchez to irrigate fields, harvest alfalfa and load/stack hay in its hay operation at ranch headquarters. This was clearly outside the scope of his employment agreement and explicitly falls outside the category of "production of livestock" under 20 CFR § 655.201.

45.     For the last 10 years of his employment, Mr. Vilchez spent most of the summer responsible for irrigation tasks at ranch headquarters, and he spent multiple weeks thereafter cutting alfalfa, loading trailers, and stacking hay at ranch headquarters.

46.     On average, Defendants required Mr. Vilchez to work on tasks at ranch headquarters 13 hours per day, seven days per week. Indeed, Mr. Vilchez generally had to work from sunrise to sunset, even during the summer. And although Mr. Vilchez had fewer tasks to perform on Sundays, he still had to wake up at sunrise and complete various feeding activities around the ranch before he could have any time to rest.

47.     Augusts were extremely busy months. The Brothers tasked Mr. Vilchez with: cutting Alfalfa as early as 2:00 a.m.; feeding sheep at 5:00 a.m.; and feeding the cattle thereafter. After feeding the cattle, Mr. Vilchez would have to go back out to the fields to adjust the irrigation. During his last 10 years of employment, Mr. Vilchez often worked more than 16 hours per day on the ranch during August.

48.     On average, Mr. Vilchez spent approximately 20% of his time annually doing mechanic work; 30% tending to Defendant's Alfalfa crops; 30% working on miscellaneous

ranch hand tasks such as washing vehicles and making repairs around the ranch headquarters; and 20% of his time tending to the sheep and cattle.

49.     Although Mr. Vilchez spent the vast majority of his time working as a ranch hand at ranch headquarters, throughout his tenure, Defendants paid him the lower, monthly AEWR meant for H-2A employees engaged in herding and production of livestock on the range.

### Mr. Vilchez's Working Conditions

50.     Defendants provided Mr. Vilchez and its other H-2A employees with a house at the ranch headquarters. Mr. Vilchez resided in this house for almost his entire tenure with Defendants.

51.     The house had two bedrooms, each with one bed. However, Defendants regularly assigned four to five workers to the same house. Therefore, Mr. Vilchez was forced to sleep on the couch, and others had to sleep on the floor. At times, Mr. Vilchez had no private space dedicated to him or his possessions.

52.     Additionally, when Mr. Vilchez and other H-2A employees had to do tasks like irrigating fields, harvesting alfalfa, and building fences at ranch headquarters, Defendants did not provide them with sufficient water to work a full day. The company did not provide coolers or bottled water, and Mr. Vilchez often found himself extremely dehydrated as a result.

53.     Throughout his tenure with Defendants, the Brothers also treated Mr. Vilchez and the other H-2A employees in a hostile and degrading manner on an almost daily basis.

Indeed, the Brothers frequently berated Mr. Vilchez and the other H-2A employees, used profanity, and threatened them with physical violence.

54.     For example, as set forth in more detail below, the Brothers called Mr. Vilchez a "girl" or insinuated that he was weak if he could not do something, they referred to him as a "cocksucker" or "son of a bitch", and they threatened to kill him or "kick his ass" if he did not want to perform a dangerous task. This sort of conduct occurred on a weekly, if not daily, basis.

55.     Mr. Vilchez also suffered serious injuries while working, and in contravention of the Utah Worker's Compensation Act, Defendants refused to provide him with medical care and treatment.

56.     For example, in 2003, Mr. Vilchez severely cut the middle finger on his right hand while doing mechanic work. Rather than giving Mr. Vilchez medical care, Kelly Kunzler instructed him to wrap his finger in black tape and continue to work for the rest of the day. Mr. Vilchez suffered permanent damage to his finger and still cannot bend it properly due to this injury.

57.     In 2008, Mr. Vilchez suffered a cut on his left hand that required 20 stitches. Although he was allowed to obtain the stitches, Defendants required Mr. Vilchez to use his bandaged left hand the very next day on a welding project. Mr. Vilchez now suffers from numbness in his left hand due to this injury.

58.     In April of 2015, Mr. Vilchez suffered a shoulder injury while at work during the busy lambing season. He asked repeatedly to go do the doctor, but Defendants refused.

59.     It was not until 2016, when Mr. Vilchez began complaining about his shoulder again, that Defendants allowed him to get medical attention. Although the doctor who treated Mr. Vilchez instructed him to rest, the Brothers did not allow him to do so. Instead, the Brothers yelled at Mr. Vilchez for trying to rest, told him there was a lot of work to do, and humiliated him by calling him a woman and saying he was not strong like a man.

60.     During 2016, both Burt Kunzler and Kerry Kunzler required Mr. Vilchez to ride horses, even though Mr. Vilchez had an injured shoulder. On one occasion, Burt Kunzler made Mr. Vilchez mount a horse known for bucking, and the horse bucked Mr. Vilchez off onto a rocky embankment. On another occasion, Kerry Kunzler failed to restrain a horse and the horse bucked Mr. Vilchez to the ground. Mr. Vilchez landed on his back and head and suffered headaches for three to four days following the fall. After the second fall, Mr. Vilchez asked the Brothers to take him to the doctor, but they refused.

61.     Mr. Vilchez's shoulder injury continued to affect him during 2017. Despite this, Kerry Kunzler required him to lift a heavy trailer ramp, causing Mr. Vilchez to strain and further injure his shoulder. A doctor thereafter recommended surgery to repair Mr. Vilchez's shoulder, but Defendants refused to provide such medical treatment.

62.     Similarly, in May of 2020, Mr. Vilchez suffered an injury when a horse kicked him in the shoulder. Mr. Vilchez almost passed out from the pain and asked to go to the hospital. However, the brothers refused to take him, and Kelly told Mr. Vilchez he needed "to toughen up" and "don't be a girl."

**Defendants' Violations of the TVPRA**

63.     As set forth above, Mr. Vilchez and Defendants' other H-2A employees had annual work contracts that generally ran from February or March to late November each year.

64.     Mr. Vilchez returned to Peru for the off-season (*i.e.*, generally in December and January), and upon information and belief, Defendants' other H-2A employees generally returned to their countries of origin during the off-season.

65.     When Mr. Vilchez and the other H-2A employees returned to Utah in February or March of each year, Defendants had a practice of taking their passports, supposedly "for employment reasons." Defendants maintained this practice from approximately 2002 to 2016.

66.     From 2002 to 2016, Defendants thereafter retained those passports for the duration of the employees' annual work contracts. During this time-period, Defendants generally returned the passports in October or November, shortly before the annual work contracts ended and the H-2A employees were supposed to be returning to their countries of origin.

67.     Additionally, although Mr. Vilchez and the other H-2A employees were supposed to be paid twice a month (pursuant to the annual contracts), Defendants paid Mr. Vilchez and the other H-2A employees infrequently. Indeed, from 2002 to 2016, Defendants issued paychecks to Mr. Vilchez and the other H-2A employees only once every two to three months.

68.    Defendants' location in Park Valley, Utah is remote. The town does not have a gas station, grocery, or any public services other than a church and a school. The closest gas station lies approximately 40 miles to the east in the remote town of Snowville, Utah.

69.    Despite this, and although most (if not all) of the H-2A employees did not have money or access to their passports, Mr. Vilchez saw various H-2A employees escape from the ranch during his tenure with Defendants. Specifically, one H-2A worker escaped the ranch in 2002, four escaped in 2010 and one escaped in 2016.

70.    Burt Kunzler always became enraged after employees escaped. At times he even threatened to report the escaping employees to immigration, shouting they would be deported back to their "shit can Peru."

71.    In 2016, after an H-2A employee escaped, the Department of Labor ("DOL") visited Defendants' ranch headquarters. Based on information and belief, the employee notified the DOL that the working conditions were unbearable, and that Defendants were not paying H-2A employees properly and were withholding workers' passports.

72.    Upon learning of the DOL's impending arrival, the Brothers directed Mr. Vilchez to go up into the mountains and hide until 3:00 p.m. When Mr. Vilchez asked why, the Brothers told Mr. Vilchez that he did not have the correct visa, and if caught, he would be deported to Peru.

73.    Upon information and belief, Defendants lied to the DOL during the visit, claiming that Mr. Vilchez spent most of his time working in the mountains as required by his visa and his annual work-contract.

74.     After the DOL's 2016 visit, Defendants stopped confiscating Mr. Vilchez's and the other H-2A employees' passports and began paying them every 15 days.

75.     However, Defendants found other ways to threaten and coerce Mr. Vilchez and the other H-2A employees into staying and working at the ranch.

76.     For example, in 2016, Burt Kunzler promised Mr. Vilchez that Defendants would pay for an immigration attorney to help Mr. Vilchez apply for legal permanent residency.

77.     In reliance on this promise, Mr. Vilchez sought an immigration attorney and paid him a $3,000 retainer. However, Defendants never reimbursed Mr. Vilchez as promised.

78.     Additionally, between 2016 and 2018, Mr. Vilchez's attorney made several attempts to reach Mr. Vilchez by phone and/or U.S. mail at the ranch headquarters. However, the Brothers never forwarded the correspondence or messages to Mr. Vilchez, and as a result, Mr. Vilchez's immigration application was denied.

79.     Defendants also threatened Mr. Vilchez and the other H-2A employees when they were reluctant to step into dangerous situations. For example, the Brothers frequently asked Mr. Vilchez and the other H-2A employees to work inside pens filled with agitated cattle. When Mr. Vilchez voiced that he did not want to enter the pen, the Brothers frequently threatened him with physical violence, stating things like: "If you don't, I will kick your ass," "I will kill you, you stupid cocksucker," and "I'll kill you son of bitch."

80.     Similarly, Defendants threatened to deport Mr. Vilchez if he requested a break or medical care. For example, in April of 2019, Mr. Vilchez and Kelly Kunzler were

attempting to lasso a cow when it jumped and hit Mr. Vilchez in the knees and arm. Mr.

Vilchez was stunned by the impact and had to take a moment to sit and rest. In response,

Kelly called Mr. Vilchez a cry baby and stated if he (Mr. Vilchez) did not stop "whining,"

Kelly would "send [him] back to Peru."

**FIRST CLAIM FOR RELIEF**
**(Failure to Pay Minimum Wage in Violation of the**
**Fair Labor Standards Act, against all Defendants)**

81.     Mr. Vilchez realleges and incorporates by reference the allegations set forth

above.

82.     Mr. Vilchez brings this civil action to recover damages for wage and other

violations no later than three years after his cause of action arose. 29 U.S. Code § 255.

83.     Defendants acted as an enterprise whose annual revenue is above $500,000,and

Defendants were subject to the requirements of the FLSA.

84.     Mr. Vilchez used tools, equipment, goods, and/or materials that had been moved in

interstate commerce to perform his job duties for Defendants.

85.     At all times relevant hereto, Defendants were employers as defined under 29

U.S.C. § 203 and were joint-employers as defined by 20 C.F.R. § 655.103, 29 C.F.R. 501.3,

and/or 29 C.F.R. § 791.2.

86.     While employed by Defendants, Mr. Vilchez did not spend more than 50%

of his time each year on the range, carrying out range production duties. *See* 29 C.F.R. §§

780.323 - 780.327.

87.     As such, Mr. Vilchez was a non-exempt H-2A worker, and he was entitled

to earn a federal hourly wage.

88.     Accordingly, "If the worker is paid by the hour, the employer must pay the worker at least the AEWR, the prevailing hourly wage rate, the prevailing piece rate, the agreed-upon collective bargaining rate, or the Federal or State minimum wage rate, in effect at the time work is performed, whichever is highest, for every hour." 20 C.F.R. § 655.122.

89.     Mr. Vilchez was entitled to earn the applicable federal hourly wage for every hour he worked for Defendants.

90.     Defendants' failure to pay Mr. Vilchez at least the federal minimum wage of $7.25 per hour was a willful violation of the FLSA, 29 U.S.C. §206.

91.     Mr. Vilchez is entitled to unpaid minimum wage beginning three years prior to the filing of this Complaint because the Defendants acted knowingly, intentionally, and willfully and/or showed reckless disregard as to whether their conduct was prohibited by the FLSA. See 29 U.S.C. § 255.

92.     Upon information and belief, Defendants have also failed to make, keep and preserve records sufficient to determine the days and hours Mr. Vilchez worked, in violation of the FLSA, 29 U.S.C. § 201, *et seq.*, including 29 U.S.C. §§ 211(c) and 215(a).

93.     As a result of the aforementioned willful violations of the FLSA's minimum wage provisions, Defendants are liable pursuant to 29 U.S.C. § 216(b) for unpaid minimum wage compensation, liquidated damages, interest (both pre- and post-judgment), reasonable attorneys' fees and costs associated with this action, and any other and further relief this Court deems appropriate.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract, against all Defendants)

94.     Mr. Vilchez realleges and incorporates by reference the allegations set forth above.

95.     At all times relevant hereto, Defendants were joint employers as defined by 20 C.F.R. § 655.103 and 29 C.F.R. 501.3.

96.     Defendants entered into annual H-2A work contracts with Mr. Vilchez every year from 2002 to 2020.

97.     The work contracts set forth Defendants' obligations with respect to the type of work to be performed, amount of pay, workers' compensation insurance provisions, housing, water, and compliance with all applicable federal laws and regulations. *see*, *e.g.*, Exhibit A.

98.     Each year, the contracts were based on job offers that Defendants submitted to the DOL. 20 C.F.R. § 655.122 (q);

99.     Pursuant to its H-2A job offers and by operation of law under the H-2A regulations, Defendants were further contractually obligated to Mr. Vilchez to abide by all applicable federal, state, and local employment-related laws and regulations.

100.     Mr. Vilchez performed all conditions, covenants, and agreements to be performed pursuant to the work contracts.

101.     However, Defendants materially breached their contractual obligations. Specifically, Defendants required Mr. Vilchez to live and work at the ranch headquarters

for most of his time while employed by Defendants, thus Mr. Vilchez did not spend more than 50% of his time, each year, on the range. See 29 C.F.R. §§ 780.323 - 780.327.

102.    Furthermore, Defendants materially breached their contractual obligations by tasking Mr. Vilchez with an inordinate number of duties not incidental to raising livestock, such as haying, irrigation, and vehicle repair; thus Mr. Vilchez was not principally engaged in the production of livestock.

103.    As such, Mr. Vilchez was a non-exempt H-2A worker and he was entitled to earn a federal hourly wage.

104.    "If the worker is paid by the hour, the employer must pay the worker at least the AEWR, the prevailing hourly wage rate, the prevailing piece rate, the agreed-upon collective bargaining rate, or the Federal or State minimum wage rate, in effect at the time work is performed, *whichever is highest*, for every hour." See 20 C.F.R. § 655.122(l) (emphasis added).

105.    Defendants' failure to pay Mr. Vilchez the applicable AEWR was a violation of H-2A regulations, and therefore, constituted a material breach of Mr. Vilchez's annual work contracts.

106.    Additionally, Defendants' failure to pay Mr. Vilchez minimum wage was a violation of the FLSA, and therefore, constituted a material breach of Mr. Vilchez's annual work contracts.

107.    Defendants further materially breached its contractual obligations by, among other things, failing to provide statements of earnings, failing to provide housing that complied with federal regulations, failing to provide workers' compensation insurance

coverage, confiscating Mr. Vilchez's passport and failing to provide a sufficient amount of potable water.

108.    As a direct and proximate result of Defendants' breaches, Mr. Vilchez has been injured and is entitled to relief for breach of contract. Specifically, Mr. Vilchez is entitled to the full amount of the unpaid wages, at the applicable AEWR rate and/or the applicable federal minimum wage rate, six years prior to the filing of this Complaint, as well as interest (both pre- and post-judgment), reasonable attorneys' fees, and costs associated with this action, and any other and further relief this Court deems appropriate.

## THIRD CLAIM FOR RELIEF
### (Violation of Trafficking Victims Protection Reauthorization Act of 2003, against all Defendants)

109.    Mr. Vilchez realleges and incorporates by reference the allegations set forth above.

110.    This claim arises under the TVPRA.

111.    In violation of 18 U.S. Code §1589(a), Defendants knowingly recruited, harbored, provided, or obtained by any means, Mr. Vilchez, for labor or services by means of: threats of force or physical restraint; threats of serious harm; the abuse or threatened abuse of law or legal process; and/or a scheme, plan, or pattern intended to cause Mr. Vilchez to believe that, if he did not perform such labor or services, that he would suffer serious harm or physical restraint.

112.    In violation of 18 U.S.C. § 1589(b), Defendants, knowingly or in reckless disregard of the facts, participated in a venture that obtained labor or services by means described in the paragraph above, and thereby knowingly benefitted financially.

113.    In violation of 18 U.S.C. § 1592, Defendants knowingly removed, confiscated, or possessed Mr. Vilchez's passport: in the course of a violation of 18 U.S.C. §1589; with the intent to violate 18 U.S.C. §1589; and/or to prevent or restrict or to attempt to prevent or restrict, without lawful authority, Mr. Vilchez's liberty to move or travel, in order to maintain the labor or services of Mr. Vilchez, when Mr. Vilchez was the victim of a severe form of trafficking in persons.

114.    As a result, Mr. Vilchez suffered injuries and is entitled to damages pursuant to 18 U.S.C § 1595 dating back 10 years; including liquidated damages under the FLSA, breach of contract, and all compensatory damages, including interest (both pre- and post-judgment).

115.    Further, Mr. Vilchez is entitled to reasonable attorneys' fees pursuant to 18 U.S. Code § 1595 and punitive damages under common law standards.

## FOURTH CLAIM FOR RELIEF
### (Promissory Estoppel)

116.    Plaintiff realleges and incorporates by reference the allegations set forth above.

117.    Defendants made promises to Mr. Vilchez about the type of work, the duration of work, and the working conditions they would give Mr. Vilchez in the United States on the H-2A visa.

118.    Defendants made these promises initially, prior to Mr. Vilchez' first arrival, and then repeatedly prior to each time he took a trip back to Peru during the winter.

119.    Defendants should have reasonably expected that their promises would induce Mr. Vilchez to act/refrain from acting such as by accepting the employment and entering the United States on the H-2A visa.

120.    Mr. Vilchez was induced to act and/or refrained from acting based on the promises made by Defendant.

121.    Defendants broke their promises to Mr. Vilchez. As a proximate result, Mr. Vilchez suffered injuries.

122.    Injustice can only be avoided by the enforcement of Defendant's promises.

## FIFTH CLAIM FOR RELIEF
### (Quantum Meruit)

123.    Plaintiff realleges and incorporates by reference the allegations set forth above.

124.    Mr. Vilchez performed valuable services for the Defendants.

125.    Defendants directed Mr. Vilchez to perform those services, accepted the benefit of those services and knew that Mr. Vilchez expected compensation for those services.

126.    Mr. Vilchez is entitled to compensation in quantum meruit at least at the lawful minimum wage applicable to those services, if not more.

## SIXTH CLAIM FOR RELIEF
### (Intentional Infliction of Emotional Distress, against all Defendants)

127.    Plaintiff realleges and incorporates by reference the allegations set forth above.

128.   Defendants subjected Mr. Vilchez to outrageous conduct that offended the generally accepted standards of decency and morality. This conduct included, but was not limited to: berating Mr. Vilchez and humiliating him on an almost daily basis (referring to him as "cocksucker" or "son of a bitch"); threatening to kill him or "kick his ass" if he did not want to perform dangerous tasks; refusing to provide him with a bed or sufficient water (leaving him ill with dehydration); and confiscating his passport so he was unable to leave his intolerable and inhumane working conditions. This sort of conduct occurred on a weekly, if not daily, basis throughout Mr. Vilchez's tenure with Defendants.

129.   Defendants engaged in this outrageous and intolerable conduct with the intention to cause or with reckless disregard for the probability of causing severe emotional distress.

130.   To the extent that said outrageous conduct was perpetrated by certain Defendants, the remaining Defendants adopted and ratified said conduct with a wanton and reckless disregard of the deleterious consequences to Mr. Vilchez.

131.   As a proximate result of Defendants' misconduct or omissions, Mr. Vilchez has suffered and continues to suffer extreme mental distress, humiliation, anguish, and emotional and physical injuries, as well as economic losses, in amounts to be proven at trial. Among other symptoms, Mr. Vilchez suffered headaches, trouble eating and digestive issues because of the way Defendants treated him.

132.   Defendants committed the acts alleged herein maliciously, fraudulently and oppressively with the wrongful intention of injuring Mr. Vilchez, from an improper and

evil motive amounting to malice and in conscious disregard of Mr. Vilchez's rights, entitling him to recover punitive damages in amounts to be proven at trial.

## SEVENTH CLAIM FOR RELIEF
**(Negligent Infliction of Emotional Distress, against all Defendants)**

133.   Plaintiff realleges and incorporates by reference the allegations set forth above.

134.   Defendants engaged in conduct that resulted in illness and bodily harm to Mr. Vilchez.

135.   This conduct included, but was not limited to: berating Mr. Vilchez and humiliating him on an almost daily basis (referring to him as "cocksucker" or "son of a bitch"); threatening to kill him or "kick his ass" if he did not want to perform dangerous tasks; refusing to provide him with a bed or sufficient water (leaving him ill with dehydration); and confiscating his passport so he was unable to leave his intolerable and inhumane working conditions. This sort of conduct occurred on a weekly, if not daily, basis throughout Mr. Vilchez's tenure with Defendants.

136.   As a proximate result of Defendants' misconduct or omissions, Mr. Vilchez has suffered and continues to suffer extreme mental distress, humiliation, anguish, and emotional and physical injuries such as headaches, trouble eating and digestive issues because of the way Defendants treated him.

137.   Defendants should have known that this conduct would cause Mr. Vilchez to suffer emotional distress, and further should have realized that Mr. Vilchez's emotional distress might result in illness or bodily harm.

## **REQUEST FOR JURY TRIAL**

Plaintiff requests that this matter be tried before a jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against the Defendant,

A.      Declaring that Defendants violated FLSA and awarding Plaintiff unpaid minimum wages, and statutory liquidated damages;

B.      Declaring that Defendants breached their work contracts with Plaintiff and awarding Plaintiff damages resulting from those breaches, including but not limited to the full amount of the unpaid wages at the applicable AEWR rate;

C.      Declaring that Defendants violated TVPRA and awarding Plaintiff damages in an amount to be proven at trial;

D.      Entering judgment against Defendants on Plaintiff's intentional infliction of emotional distress claim and/or negligent infliction of emotional distress and awarding Plaintiff damages for the distress, according to proof;

E.      Awarding pre-judgment and post-judgment interest at the highest lawful rate;

F.      Awarding attorneys' fees and costs of this action, including expert witness fees, as appropriate;

G.      Awarding punitive damages;

H.      Awarding Plaintiff an offset equal to the additional tax burden for all unpaid wages; and

I.      Granting such other relief as this Court deems just and equitable.


DATED this 15th day of October, 2021.


                                        /s/ Chad Johnson
                                        Kass Harstad
                                        Chad Johnson
                                        *Attorneys for Plaintiff*